UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| KEVIN WINDLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:18-cv-01212-SEB-TAB |
| | ) | |
| STATE OF INDIANA a governmental entity, | ) | |
| et al. | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendants' Motion for Summary Judgment

[Dkt. 34], filed on June 10, 2019. Plaintiff Kevin Windle has brought this action against

Defendants State of Indiana ("the State"), Indiana State Police ("ISP"), Darnell

Ledsinger, Dan Herron, David Salley, and Nathaniel Raney, alleging various

constitutional violations under 42 U.S.C. § 1983 as well as a state law claim for

intentional infliction of emotional distress. Defendants have moved for summary

judgment on all claims alleged in the Complaint, with the exception of the excessive

force claim alleged against Defendants Raney and Salley. For the reasons detailed

below, we <u>GRANT IN PART</u> and <u>DENY IN PART</u> Defendants' Motion.[1]

---

[1] Plaintiff abandoned several claims by failing to respond to Defendants' arguments in favor of summary judgment. Accordingly, summary judgment is <u>granted</u> in Defendants' favor on <u>Count I</u> (§ 1983 conspiracy), <u>Count IV</u> (§ 1983 malicious prosecution), and <u>Count V</u> (*Monell* claim), as well as all claims against the State, the ISP, and any ISP trooper in his official capacity.

## Factual Background

On April 20, 2016, Mr. Windle attended a political rally for then-presidential candidate Donald Trump at the Indiana State Fairgrounds ("the Rally"). No surprise, a number of protesters attended the Rally as well. At the end of the Rally, as Mr. Windle was returning to his vehicle in the parking lot, an unknown individual or individuals in the crowd knocked the sign he was carrying out of his hand, spit on him, and kicked him.

According to Mr. Windle, he saw a man wearing "a Butler t-shirt" in the crowd who was also being harassed by "this mob of people [who] were all screaming fuck Trump and poking [the man] and hitting him and putting the flag around his head." Windle Dep. at 12–13. Mr. Windle "gave one of the guys the finger and told him to leave [the man] the fuck alone or something to that nature." *Id.* In video footage of the incident, Mr. Windle is seen flashing his middle finger at a woman wearing a light blue dress and at another person wearing a black hoodie sweatshirt and a mask and carrying a skateboard. Defs.' Exh. 3.

As these events unfolded, Lt. Ledsinger of the Indiana State Police moved through the crowd toward the disturbance, yelling to Mr. Windle and the protestors to step back. Several protesters attempted to grab Mr. Windle's arm and, he contends, hit, slapped, and poked him. An unknown individual pulled Mr. Windle's hat off his head, prompting Mr. Windle to reach out and move in the direction of that person. Lt. Ledsinger reached Mr. Windle at this point, extended his arms and separated Mr. Windle and the other man as they were yelling at each other. In an effort to control the situation, Lt. Ledsinger shouted instructions to the men to "get back." Defs.' Exh. 6. Mr. Windle and a man

wearing a polo shirt continued to argue as Lt. Ledsinger stood between them with his arms extended in an attempt to keep them separated. At approximately this point, two plainclothes Indiana State Troopers, Defendants Trooper Raney (wearing a gray shirt) and Det. Salley (wearing a green shirt), along with three uniformed Indiana State Troopers, including Defendant Trooper Herron, approached the scene from behind Lt. Ledsinger.

Mr. Windle continued pointing and shouting at the man who had taken his hat, shaking off various individuals in the crowd who were trying to restrain him. According to Mr. Windle, he was attempting to identify for Lt. Ledsinger the man who had taken his hat. Lt. Ledsinger turned toward Mr. Windle and with his hands on Mr. Windle's chest, began walking him backward, pushing him away from the crowd to a location between parked vehicles in the parking lot. In the process of being walked backward, Mr. Windle stumbled and then fell straight back onto the concrete. Unable to brace himself with his hands as he fell, he hit his head on the pavement. Defendants contend that Mr. Windle's fall occurred as a result of his having simply lost his balance, but Mr. Windle claims that his fall was caused by Lt. Ledsinger pushing him roughly in the chest with both hands and "slam[ming him] to the ground." Windle Dep. at 197.

As Mr. Windle fell, Trooper Raney and Det. Salley rushed in to assist behind Lt. Ledsinger. When Trooper Herron saw two men in street clothes coming up behind Lt. Ledsinger, he mistook them as non-law enforcement and ran over to assist Lt. Ledsinger, in the process shoving Trooper Raney with both hands and knocking him to the ground on top of Mr. Windle. No video footage depicting what transpired after this point is

3

available, as far as we have been told.  According to Mr. Windle, Trooper Raney, Det.

Salley, and Trooper Herron all jumped on top of him while he was on the ground,

grabbed his legs and twisted them; one of the men put a knee in his back and pressed

down on his neck and head so that his face was pushed onto the blacktop surface.  Mr.

Windle claims that Defendants proceeded to yank his right arm upwards to a level even

with his head and he heard his shoulder pop.  When he was being handcuffed, one of the

Defendants said to him, "Give me your left arm," whereupon Mr. Windle replied that he

was unable to do so because he was disabled.[2]

Once handcuffed, Mr. Windle was directed to stand up.  He allegedly repeatedly

told Defendants that he could not get up off the ground because of his disability.  Each

time he said this, he alleges, the officers picked him up to a height where only his knees

were touching the ground before pushing him back down again onto the blacktop,

causing his face to hit the hard surface approximately ten times before Defendants lifted

him up onto his feet and transported him by golf cart to a staging area until being taken to

the VA Hospital and thereafter transferred to the Marion County Sheriff's Department,

where he was detained.

The following day, April 21, 2019, Mr. Windle was arraigned in Marion Superior

Court on a charge of disorderly conduct, in violation of Indiana Code § 35-45-3(a)(1).

Based on the probable cause affidavit executed by Trooper Raney, the court determined

there was probable cause to support Mr. Windle's arrest.  Mr. Windle was released from

---

[2] About a year before the incident giving rise to this litigation, Mr. Windle was in a motorcycle collision and was thrown through a car windshield, suffering serious injuries.

custody following his arraignment and the charge of disorderly conduct was dismissed on August 31, 2016. On September 13, 2016, a new charge of disorderly conduct was brought against Mr. Windle as well as two counts of resisting law enforcement, in violation of Indiana Code § 34-44.1-3-1(a)(1). The Marion Superior Court again found probable cause for Mr. Windle's arrest, based on a second affidavit executed by Trooper Raney.[3] Mr. Windle eventually was acquitted on all charges on December 14, 2017, following a jury trial. This civil litigation ensued.

## Legal Analysis

## I. Evidentiary Issues

Before resolving the substantive issues raised in Defendants' Motion for Summary Judgment, we must address certain evidentiary issues. Defendants have interposed objections to the following evidentiary submissions by Mr. Windle: (1) the criminal trial transcript; and (2) the opinions of Mr. Windle's experts. The parties also disagree over whether Mr. Windle should be permitted to withdraw his admissions. We address each of these issues in turn below.

### A. Criminal Trial Transcript

Defendants challenge the admissibility of the transcript from Mr. Windle's criminal trial on the charges of disorderly conduct and resisting arrest arising from the incident underlying this litigation on grounds that it is unauthenticated and constitutes

---

[3] Mr. Windle claims that these probable cause affidavits contained intentional falsehoods, a contention which will be addressed below.

inadmissible hearsay.  For the following reasons, we are not persuaded by Defendants'
arguments.

The Seventh Circuit has recognized that "transcripts of testimony may be
considered in support of, or opposition to, a motion for summary judgment."  *Williams v.
Vasquez*, 62 Fed. App'x 686, 692 (7th Cir. 2003); *accord Kelley v. Price-Macemon, Inc.*,
992 F.2d 1408, 1415 n.12 (5th Cir. 1993) ("It is well-settled that a certified transcript of a
judicial proceeding may be considered on a motion for summary judgment.");
*Beiswenger Enters. Corp. v. Carletta*, 46 F. Supp. 2d 1297, 1299 (M.D. Fla. 1999) ("Trial
testimony, even when from a proceeding in which the parties, subject matter, and counsel
are not the same can be used because it is sworn testimony which is at least as reliable as
that found in affidavits."); *Kraft Gen. Foods, Inc. v. Cattell*, 18 F. Supp. 2d 280, 284
(S.D.N.Y. 1998) ("Sworn testimony from another trial is admissible on a motion for
summary judgment.").  Here, the transcript of Mr. Windle's state court trial is certified as
"full, true, correct, and complete" by the Official Court Reporter for the Marion Superior
Court Criminal Division 7 and contains the court reporter's electronic signature.  This is
sufficient for authentication purposes at this stage of the litigation, particularly
considering that Defendants have not pointed out any specific errors in the trial transcript.
*See, e.g.*, *Ball v. A.O. Smith Corp.*, 321 B.R. 100, 105–07 (N.D.N.Y. 2005) (holding that
trial transcripts of unrelated proceedings were admissible under Rule 902(4) even without
an authenticating witness, where transcripts contained court reporter certifications).

With regard to Defendants' hearsay objection, "transcripts are not 'hearsay'
merely because they consist of statements made by a witness in a prior proceeding, any

more than an affidavit or a deposition offered in support of a motion for summary judgment is inherently hearsay." *Ricupero v. Wuliger, Fadel & Beyer*, No. 1:91CV0589, 1994 WL 483871, at *4 (N.D. Ohio Aug. 26, 1994). To the extent the testimony in the criminal trial itself contains hearsay statements, we will not consider that portion of the testimony unless it falls within a hearsay exception. Otherwise, the trial transcript, to the extent that it is relevant, is available for consideration by the court on summary judgment.

### B.      Expert Opinions

Mr. Windle seeks to rely on the reports of two experts, Jeffrey J. Noble and Robert C. Gregori, M.D., in support of his response to Defendants' motion for summary judgment. Defendants object to these expert opinions on the grounds that they were not timely disclosed to them by Mr. Windle. It is undisputed that the expert witness disclosure deadline applicable here was May 20, 2019, and that Mr. Windle did not disclose either of his experts until June 20, 2019, when he filed his summary judgment response. Plaintiff's counsel has provided no explanation for these untimely disclosures, arguing only that Defendants have not been prejudiced by the delay because the experts were disclosed approximately one month before the July 22, 2019 close of expert discovery. This fact neither cures the untimely disclosures nor eliminates Defendants' prejudice. Thus, we will exclude the opinions of Plaintiff's experts in reaching our summary judgment decision.

### C.      Withdrawal of Admissions

Defendants maintain that Mr. Windle should be deemed to have admitted all Defendants' requests for admissions and that his belated attempt to withdraw them should

be overruled. Defendants served their requests for admissions on February 13, 2019, to which answers were due no later than March 18, 2019. Mr. Windle did not respond by this deadline. Thus, on March 21, 2019, Defendants' counsel informed Plaintiff's counsel via email that Defendants' first request for admissions was deemed admitted pursuant to Federal Rule of Civil Procedure 36. Shortly after this email exchange, Mr. Windle's responses to Defendants' request for admissions were provided to Defendants, but Plaintiff's counsel never officially moved to withdraw the admissions. Only after Defendants moved for summary judgment based in part on Mr. Windle's admissions did his counsel address the withdrawal of the admissions in a footnote in his response to Defendants' motion, arguing that permission to withdraw his admissions should be granted to allow a ruling on the merits and, further, Defendants would not be prejudiced by such a withdrawal because they had received Plaintiff's responses approximately three months prior to filing their summary judgment motion thereby allowing ample time to examine the answers before discovery had closed.

Rule 36(a)(3) provides that "[a] matter is admitted unless within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection …." Fed. R. Civ. P. 36(a)(3). "Rule 36(a) is self-executing, meaning that no court intervention is necessary for an admission to be established, and failure to timely respond results in the admission of the matters raised in a request for admissions." *Hardwick v. John and Mary E. Kirby Hosp.*, No. 10-CV-2149, 2011 WL 4433764, at *2 (N.D. Ill. Sept. 22, 2011) (citation and quotation marks omitted). Thus, "[w]here no response is made to requests for admissions, the party making the requests is

entitled to rely thereupon and no further proof is required to be made of the facts thus admitted." *Mangan v. Broderick & Bascom Rope Co.*, 351 F.2d 24, 28 (7th Cir. 1965).

A court may, however, permit withdrawal of an admission "if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits." Fed. R. Civ. P. 36(b). "The party who obtained the admissions bears the burden of showing that withdrawal would result in prejudice; the party seeking the withdrawal bears the burden of demonstrating that withdrawal would promote decision of the matter on its merits." *Branson v. Celadon Trucking Servs., Inc.*, No. 1:14-cv-01009-JMS-MJD, 2014 WL 5640774, at *1 (S.D. Ind. Nov. 3, 2014). Although "[t]he proper procedural vehicle through which to attempt to withdraw admissions … is a motion under Rule 36(b) to withdraw admissions," *Kalis v. Colgate–Palmolive Co.*, 231 F.3d 1049, 1059 (7th Cir. 2000), which Mr. Windle failed to do here, we construe his argument in his summary judgment response as a request to withdraw admissions. *See Chisholm v. Cancer Treatment Ctrs. of Am.*, No. 01 C 0947, 2002 WL 31085090, at *2 (N.D. Ill. Sept. 18, 2002) ("[T]he court may construe plaintiff's argument as a request to withdraw admissions ….").

The first prong, to wit, whether withdrawal would promote the presentation of the merits of the action, "can be met when the deemed admissions effectively resolve the case and thus upholding the admissions eliminates the need for a presentation on the merits." *Wilson v. Comlux Am.*, No. 1:11-cv-00980-RLY-MJD, 2013 WL 593974, at *2 (S.D. Ind. Feb. 14, 2013). Here, Defendants have substantially relied upon Mr. Windle's

deemed admissions to support their motion for summary judgment, thereby potentially eliminating the need for evidence as to the merits of his claims if he is not permitted to withdraw them; however, other factual assertions included in Defendants' request for admissions have been disputed. Accordingly, the first factor of Rule 36(b) tends to support allowing Mr. Windle to withdraw his deemed admissions.

With regard to the second prong of Rule 36(b), Defendants have not demonstrated that they will be prejudiced if the admissions are withdrawn. "Having to prove one's case on the merits is not the type of prejudice that satisfies Rule 36(b)." *Van Hoose v. Nucor Corp.*, No. 1:06-cv-01565-WTL-LJM, 2007 WL 2898697, at *1 (S.D. Ind. Apr. 13, 2007). Rather, "[t]he type of prejudice required to satisfy Rule 36(b) is an admission which induces the serving party to forbear from conducting other discovery in reliance upon the admission." *Baynham v. Meridian Servs. Corp.*, No. 1:11-cv-00129-TWP-MJD, 2012 WL 2792318, at *2 (S.D. Ind. July 9, 2012); *see also Perez v. Miami-Dade Cty.*, 297 F.3d 1255, 1266 (11th Cir. 2002) (holding that prejudice under Rule 36(b) "relates to the difficulty a party may face in proving its case, e.g., caused by the unavailability of key witnesses, because of the sudden need to obtain evidence with respect to the questions previously answered by the admissions") (citation and quotation marks omitted). Defendants here were in possession of Mr. Windle's belated response to their request for admissions approximately two months in advance of Mr. Windle's deposition and two and a half months before the dispositive motions deadline. In addition, they do not claim that they forewent any discovery based on his default admissions.

The only prejudice Defendants claim to have suffered is their reliance upon the default admissions in briefing their motion for summary judgment. However, "several Courts of Appeals have noted that mere preparation of a summary judgment motion in reliance on deemed admissions does not, by itself, constitute sufficient prejudice to deny motions to withdraw." *Flournoy v. Ghosh*, No. 08 C 6601, 2011 WL 5979205, at *2 (N.D. Ill. Nov. 28, 2011) (collecting cases from the Eighth, Ninth, and Tenth Circuits). Moreover, the Seventh Circuit "has never held that prejudice results from a party's efforts to prepare a summary judgment motion after securing deemed admissions." *Id.* In any event, any prejudice of this sort can be ameliorated by a reimbursement of costs incurred by Defendants in preparing the summary judgment motion. *See Van Hoose*, 2007 WL 2898697, at *2 (providing that prejudice resulting from reliance on deemed admissions in filing motion for summary judgment can be eliminated by requiring reimbursement of costs for preparing that motion).

For these reasons, we grant Plaintiff's request to withdraw the default admissions. Defendants shall submit to Plaintiff's counsel on or before Friday, December 20, 2019, a statement as to the reasonable attorney's fees incurred in preparing and filing the portions of the summary judgment briefing relying on the admissions. Plaintiff's counsel's pattern of dilatory compliance with discovery deadlines in this case is also noted in this award of fees.

## II.     Summary Judgment Standard

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a);

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

## III.    Federal Claims

### A.    Excessive Force

Lt. Ledsinger and Trooper Herron have moved for summary judgment on Plaintiff's excessive force claims against them. The Fourth Amendment guarantees citizens the right "to be secure in their persons … against unreasonable … seizures" of the person. U.S. Const. Am. IV. This includes the right to be free from an unreasonable seizure conducted through the use of excessive force. Whether the force employed by an officer in effecting a seizure is constitutionally excessive depends on its "objective reasonableness," which is judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and is considered in light of the specific facts and circumstances of that particular case. *Graham v. Connor*, 490 U.S. 386, 396, 397 (1989) (citations omitted). We address the claims against Lt. Ledsinger and Trooper Herron in this light.

### 1.    Lt. Ledsinger

Lt. Ledsinger has moved for summary judgment on Mr. Windle's excessive force claim against him on grounds that his actions were objectively reasonable in light of all the circumstances and therefore did not violate the Fourth Amendment. Lt. Ledsinger argues that his decision to push Mr. Windle back away from the crowd of protesters was a justifiable use of force, given the chaotic situation at the time and coupled with Mr. Windle's aggressive behavior and failure to obey verbal orders to step back. Lt. Ledsinger claims that his push against Mr. Windle's chest did not cause his fall, rather Mr. Windle lost his balance as he was walking backwards and the amount of force Lt. Ledsinger used was altogether reasonable, given Mr. Windle's conduct.

We agree based on the undisputed evidence that the initial amount of force used by Lt. Ledsinger to separate Mr. Windle from the crowd of protesters was objectively reasonable, which is to say, clearly not excessive, under the circumstances. However, Mr. Windle is claiming that after he complied with Lt. Ledsinger's orders and had been walked back a good distance from the crowd by Lt. Ledsinger, Lt. Ledsinger shoved him sharply in the chest, pushing him to the ground and causing him to hit his head on the pavement. Based on these alleged facts, which we must accept as true at this stage of the litigation, we cannot say that Lt. Ledsinger's conduct was reasonable as a matter of law in light of all of the circumstances. If Lt. Ledsinger did in fact shove Mr. Windle to the ground after he had already separated Mr. Windle from the crowd and had him under control, a reasonable jury could find the use of such force excessive under the circumstances. *See, e.g.*, *Hayes v. City of Indianapolis*, No. 1:08-cv-006-DFH-JMS,

2009 WL 700232, at *4 (S.D. Ind. Mar. 16, 2009) ("It has long been well established that a police officer may not continue to use force against a suspect who is subdued and complying with the officer's orders.") (collecting cases); *DuFour-Dowell v. Cogger*, 969 F. Supp. 1107, 1120 (N.D. Ill. 1997) (quoting *Lanigan v. Vill. of East Hazel Crest, Ill.*, 110 F.3d 467, 475–76 (7th Cir. 1997)) ("Even 'one violent push and poke' will constitute excessive force when there is no provocation.").

This conclusion is, of course, based on Plaintiff's version of events. Defendants maintain that video footage contradicts Mr. Windle's story, conclusively establishing that Lt. Ledsinger did not push him as he claims. If the video footage conclusively showed as Defendants' maintain that Lt. Ledsinger did not push Mr. Windle's chest causing him to fall to the ground and that instead Mr. Windle merely lost his balance as he was being slowly walked backward, our conclusion would likely be different. Similarly, if it were indisputably clear from the video footage that Mr. Windle was not complying with Lt. Ledsinger's verbal orders or was otherwise resisting or interfering with the performance of the officer's duties at the time he fell, a reasonable jury could find that some use of force by the police officer was reasonable to control the situation and maintain order in what was undisputedly a volatile atmosphere.

Because the video footage of the incident gives rise to differing interpretations between the parties and does not conclusively establish whether Lt. Ledsinger applied unnecessary force to Mr. Windle's chest just before his fall and/or whether Mr. Windle was complying with Lt. Ledsinger's orders at the time he fell, it is not within the court's

purview to make credibility determinations or weigh the evidence at the summary judgment stage to resolve these issues. Accordingly, a jury will be required.

### 2. Trooper Herron

Trooper Herron argues that Mr. Windle's excessive force claim against him fails because he never applied any force whatsoever against Mr. Windle. Trooper Herron claims that he used force only on Trooper Raney, based on his mistaken belief that Trooper Raney was a private citizen interfering in a law enforcement action, and did not touch Mr. Windle at all. Trooper Herron claims that he is entitled to summary judgment because Mr. Windle cannot show that he used any "degree of force" against Mr. Windle, which is a required element of an excessive force claim. *See, e.g.*, *McAllister v. Price*, 615 F.3d 877, 882 (7th Cir. 2010) ("Injury is not an element of an excessive-force claim; rather, it is evidence of the degree of force imposed and the reasonableness of that force.").

Mr. Windle rejoins that his excessive force claim is based, not on Trooper Herron's actions in shoving Trooper Raney, but on Trooper Herron's conduct while Mr. Windle was on the ground. Specifically, Mr. Windle claims that Trooper Herron, along with Trooper Raney and Det. Salley, twisted his arm while handcuffing him and then, after he was handcuffed, repeatedly picked him up and slammed him back down on the pavement. Defendants do not address whether if true such a level of force would have been reasonable under the circumstances. Rather, they claim that the video footage unambiguously contradicts Mr. Windle's version of events as Trooper Herron can be seen standing and speaking with Lt. Ledsinger while Trooper Raney and Det. Salley are

leaning down out of the frame arresting Mr. Windle. Thus, Defendants argue, Trooper Herron is entitled to summary judgment on the excessive force claim because the undisputed evidence establishes that he never used any force on Mr. Windle.

It appears to be uncontroverted that in one portion of the video Trooper Herron is seen speaking with Lt. Ledsinger while Mr. Windle, Trooper Raney, and Det. Salley are on the ground and out of the photo frame. However, the video records that Trooper Herron then turned away from Lt. Ledsinger and bent down in the same spot where Mr. Windle presumably remained on the ground. Shortly thereafter, and before any of the men are visible again, the video cuts away. It is impossible therefore to determine from the video footage what Trooper Herron was doing during that time. Resolving these issues will require credibility determinations that are inappropriate on summary judgment. Trooper Herron is therefore not entitled to summary judgment on the excessive force claim against him.

## B. False Arrest

To succeed on a claim for false arrest, a plaintiff must show that he was arrested without probable cause. *Brooks v. City of Chi.*, 564 F.3d 830, 832 (7th Cir. 2009) (citing *Askew v. City of Chi.*, 440 F.3d 894, 895 (7th Cir. 2006)). "[T]he presence of probable cause makes a warrantless arrest reasonable under the Fourth Amendment." *Hurem v. Tavares*, 793 F.3d 742, 745 (7th Cir. 2015) (citing *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014)). Thus, "[p]robable cause is an absolute bar to a claim of false arrest asserted under the Fourth Amendment and § 1983." *Muhammad v. Pearson*, 900 F.3d 898, 907–08 (7th Cir. 2018) (citations omitted).

To determine whether probable cause existed at the time of arrest, the court must "step into the shoes of a reasonable person in the position of the officer, considering the facts known to the officer at the time." *Williams v. City of Chi.*, 733 F.3d 749, 756 (7th Cir. 2013) (internal citation omitted). "An officer has probable cause to make an arrest only when the facts and circumstances within his knowledge and of which he has reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect has committed an offense." *Gibbs*, 755 F.3d at 537 (citation omitted). "Moreover, the court's inquiry is limited to what the officer knew at the time of the arrest and not what has been gained from hindsight." *Harney v. City of Chi.*, 702 F.3d 916, 922 (7th Cir. 2012) (citing *Mucha v. Vill. of Oak Brook*, 650 F.3d 1053, 1057 (7th Cir. 2011)). In deciding this question of law on summary judgment, the court "must give the non-moving party the benefit of conflicts in the evidence about what the officers actually knew at the time." *Williams*, 733 F.3d at 756.

Here, Defendants argue that they had probable cause to believe that Mr. Windle engaged in disorderly conduct. Under Indiana law, an individual engages in disorderly conduct when he or she "recklessly, knowingly, or intentionally: (1) engages in fighting or tumultuous conduct…." IND. CODE § 35-45-1-3(a)(1). Tumultuous conduct is defined by statute as "conduct that results in, or is likely to result in, serious bodily injury to a person or substantial damage to property." IND. CODE § 35-45-1-1. The Indiana Supreme Court has held that tumultuous conduct may be found where "it seems that a defendant's moves are likely to provoke the opposing party to respond with actions that would lead to serious bodily injury …." *Bailey v. State*, 907 N.E.2d 1003, 1007 (Ind.

2009).  Tumultuous conduct "may also occur when the aggressor appears well on his way to inflicting serious bodily injury but relents in the face of superior force or creative resistance." *Id.*

Having carefully reviewed the video footage depicting the incident and taking the facts in the light most favorable to Mr. Windle, we hold that the officers had probable cause to believe that he had engaged in disorderly conduct at the time of his arrest.  The incident arose in the course of a crowded and volatile political rally.  Defendants had observed Mr. Windle insert himself into a conflict between supporters and protesters, advance toward a large group of protesters and extend his middle finger as an intentionally rude gesture within inches of one woman's face and also the face of a second individual who was wearing a mask.  When a protester grabbed Mr. Windle's hat from his head, Defendants saw Mr. Windle lunge in the direction of the man he believed had taken his hat and aggressively shake off members of the crowd who were trying to restrain him.  Lt. Ledsinger responded by stepping between Mr. Windle and the man in an effort to separate them, while Mr. Windle continued to yell and point toward the man until Lt. Ledsinger walked Mr. Windle backwards and away from the crowd.

Under these circumstances, it was reasonable for the officers to believe that Mr. Windle's conduct, if left unchecked, could likely have led to serious bodily injury, particularly given the escalating tensions and the size and hostility of the crowd.  *Cf. Bailey*, 907 N.E.2d at 1007 (affirming the defendant's conviction for disorderly conduct on evidence that he threw down his drink and coat, stepped angrily toward the victim with clinched fists at his sides and yelled obscenities inches from the victim's face, only

backing down upon noticing law enforcement presence).  Accordingly, we hold that Defendants had probable cause to believe at the time of his arrest that Mr. Windle had engaged in tumultuous conduct as defined under Indiana's disorderly conduct statute and was subject to arrest for that offense.[4]  Defendants are therefore entitled to summary judgment on Mr. Windle's false arrest claim.

## IV.    State Law Claims

Mr. Windle has brought claims against Defendants under the Indiana Tort Claims Act ("ITCA") in Counts VI (abuse of process), VII (malicious prosecution), and VIII (intentional infliction of emotional distress ("IIED")).  Defendants have moved for summary judgment on these claims on statutory immunity grounds.  Mr. Windle rejoins that Defendants are not entitled to immunity under the ITCA because their actions were outside the scope of their employment and/or willful and wanton.  We turn to these claims now.

---

[4] We recognize that a jury found Mr. Windle not guilty of the offense of disorderly conduct, but that outcome is not dispositive of the false arrest civil claim as "the evidence required to establish probable cause is considerably less than that required to sustain a criminal conviction." *Purvis v. Oest*, 614 F.3d 713, 723 (7th Cir. 2010).  In support of his argument that there was no probable cause for his arrest, Mr. Windle cites Lt. Ledsinger's testimony in the underlying criminal trial that it was Mr. Windle's "due right" to engage with the protesters.  However, Lt. Ledsinger's subjective views of the incident formed with the benefit of hindsight are not relevant to our consideration of the issue because "Fourth Amendment claims, including those for false arrest, are analyzed under an 'objective reasonableness' standard."  *Bledsoe v. City of Chi.*, No. 96 C 2552, 1996 WL 535344, at *5 (N.D. Ill. Sept. 19, 1996) (collecting cases).  Therefore, "[t]he motives of an officer are irrelevant in determining whether an officer violated the Fourth Amendment."  *Id.*  Mr. Windle's allegation that Trooper Raney and Lt. Ledsinger intentionally included false allegations in their probable cause affidavits does not affect our analysis because we hold for the reasons given above that probable cause existed for Mr. Windle's arrest apart from any allegedly false statements.

## A.  Malicious Prosecution and Abuse of Process

The ITCA "provides substantial immunity for conduct within the scope of the employees' employment." *Ball v. Jones*, 52 N.E.3d 813, 820 (Ind. Ct. App. 2016). Pursuant to Indiana Code § 34-13-3-3(6), a government entity or employee acting within the scope of his employment is not liable for losses resulting from "[t]he initiation of a judicial or an administrative proceeding."  Both state and federal courts have held that this immunity bars Indiana claims for malicious prosecution and abuse of process against state entities and employees acting within the scope of their employment. *E.g.*, *Katz-Crank v. Haskett*, 843 F.3d 641, 651 (7th Cir. 2016) (holding that claims for malicious prosecution and abuse of process "fall[] comfortably within the state immunity bar"); *Waldrip v. Waldrip*, 976 N.E.2d 102, 116 (Ind. Ct. App. 2012) (holding that the ITCA bars claims for abuse of process); *Livingston v. Consolidated City of Indianapolis*, 398 N.E.2d 1302, 1306 (Ind. Ct. App. 1979) (same for malicious prosecution claims).

Notwithstanding the broad protections Indiana provides for its employees acting within the scope of their duties, immunity does not apply where the employee's conduct falls, *inter alia*, outside the scope of his employment or was willful and wanton.  IND. CODE § 34-13-3-5(c).  Mr. Windle contends that Defendants Raney and Ledsinger were acting willfully and wantonly and outside the scope of their employment when they intentionally included false allegations in their probable cause affidavits and arrest reports.  It is true that immunities granted by the ITCA "might be lost when an employee acts 'so far out of the scope of his or her employment as to amount to fraud or criminal conduct.'"  *Celebration Fireworks, Inc. v. Smith*, 727 N.E.2d 450, 452 (Ind. 2000)

(quoting *Poole v. Clase*, 476 N.E.2d 828, 831 (Ind. 1985)).  However, in *Ball v. Jones*,

the Indiana Court of Appeals held that a police officer's action of falsifying a probable

cause affidavit "was incidental to the conduct authorized" by his employer and "to an

appreciable extent to further his employer's business," and thus, within the scope of his

employment and therefore "cloaked with immunity under [the] ITCA."  52 N.E.3d at

820–21 (citations and quotation marks omitted).

We have previously held that probable cause existed for Mr. Windle's arrest, even

apart from the allegedly false allegations contained in Defendants' probable cause

affidavits and arrest reports.  Because Mr. Windle's arguments to overcome statutory

immunity all rely on inferences based on the absence of probable cause, "the presence of

probable cause … establishes the immunity."  *Holland v. City of Chi.*, 643 F.3d 248, 255

(7th Cir. 2011).  Defendants are therefore entitled to summary judgment on Mr. Windle's

state law malicious prosecution and abuse of process claims.

### B.    Intentional Infliction of Emotional Distress

With regard to the IIED claim, Defendants argue that they are immune under

Indiana Code § 34-13-3-3(8), which provides immunity for state entities and their

employees acting within the scope of their employment from claims resulting from "[t]he

adoption and enforcement of or failure to adopt or enforce a law (including rules and

regulations) … unless the act of enforcement constitutes false arrest or false

imprisonment."  IND. CODE § 34-13-3-3(8).  This immunity "extends well beyond

traditional law enforcement activities such as the arrest or pursuit of suspects by police,"

to include all "those activities in which a governmental entity or its employees compel or

attempt to compel the obedience of another to laws, rules or regulations, or sanction or attempt to sanction a violation thereof." *Mullin v. Mun. City of S. Bend*, 639 N.E.2d 278, 283 (Ind. 1994) (citation and quotation marks omitted). Indiana and federal courts have in some circumstances applied this immunity to IIED claims. *See, e.g.*, *Hendricks v. New Albany Police Dep't*, 749 F. Supp. 2d 863, 873 (S.D. Ind. 2010); *Parish v. City of Elkhart*, No. 3:07-CV-452, 2010 WL 4054271, at *2–4 (N.D. Ind. Oct. 15, 2010); *City of Anderson v. Davis*, 743 N.E.2d 359, 365 (Ind. Ct. App. 2001) (recognizing that "police officers [had been held] immune from liability for damages resulting from alleged intentional infliction of emotional distress").

However, "[i]mmunity under section 34-13-3-3(8) does not apply to conduct that constitutes excessive force." *Todero v. Blackwell*, 383 F. Supp. 3d 826, 842 (S.D. Ind. 2019) (citing *Wilson v. Isaacs*, 929 N.E.2d 200, 203 (Ind. 2010)). Here, because Mr. Wilson alleges that in using excessive force, Defendants intentionally inflicted emotional distress, § 34-13-3-3(8) immunity does not apply and a tort claim based on that conduct is not barred under the ITCA. *Id.*; *see also Bowens v. City of Indianapolis*, No. 1:13-cv-00072-DML-SEB, 2014 WL 4680662, at *6–7 (S.D. Ind. Sept. 19, 2014) (explaining that § 34-13-3-3(8) immunity is conduct as opposed to claim based so it does not bar IIED claims based on allegations of excessive force).

Pursuant to a second IIED theory, Mr. Wilson also claims that Defendants intentionally inflicted emotional distress on him by unlawfully arresting him and initiating criminal proceedings against him. Because we have found, as explained above, that probable cause existed for Mr. Wilson's arrest and that Defendants were acting

within the scope of their employment when they arrested him and prepared the probable cause affidavits, any IIED claim based on this theory is barred.

**V.      Conclusion**

For the foregoing reasons, Defendants' Motion for Summary Judgment is <u>GRANTED</u> as to Plaintiff's federal false arrest, malicious prosecution, conspiracy and *Monell* claims as well as his state malicious prosecution and abuse of process claims. Defendants' motion is <u>DENIED</u> as to Plaintiff's federal excessive force claim and state IIED claim also based on excessive force.  The case shall proceed accordingly.

IT IS SO ORDERED:


Date:  _____12/10/2019_____          _Sarah Evans Barker_____
                                                      SARAH EVANS BARKER, JUDGE
                                                      United States District Court
                                                      Southern District of Indiana

Distribution:

Zaki M. Ali
ATTORNEY AT LAW
zali@zakiali.com

John H. Brooke
LAW OFFICES OF JOHN H. BROOKE
jbrooke@brooke-stevens.com

Benjamin C. Ellis
INDIANA ATTORNEY GENERAL
Benjamin.Ellis@atg.in.gov

Benjamin Myron Lane Jones
INDIANA ATTORNEY GENERAL
benjamin.jones@atg.in.gov